**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SEAN KENNEDY; ANDREW
SNIDER; CHRISTOPHER WARD;
RONALD WILLIAMSON;
RANDALL WESTON,

           *Plaintiffs-Appellants*,

  v.

LAS VEGAS SANDS
CORPORATION; SANDS
AVIATION, LLC,

           *Defendants-Appellees*,
  and

LAS VEGAS SANDS, LLC;
INTERFACE OPERATIONS, LLC,

           *Defendants*.

No. 23-15311

D.C. No.
2:17-cv-00880-
APG-VCF

OPINION

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted March 6, 2024
Las Vegas, Nevada

Filed August 1, 2024

Before:  MILAN D. SMITH, JR., MARK J. BENNETT,
and DANIEL P. COLLINS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Daniel P. Collins

## SUMMARY[*]

### Labor Law

The panel affirmed the district court's judgment, after a bench trial, in favor of the defendants in an action brought under the Fair Labor Standards Act by five corporate jet pilots.

In Section I, the panel held that the pilots qualified as highly compensated employees exempt from the Act's overtime requirements, 29 U.S.C. § 207, because they made over $100,000 per year and performed primarily non-manual labor.  They also customarily and regularly made discretionary decisions over matters of significance, a duty performed by bona fide administrative, executive, or professional employees.

In Section II, the panel held that the time the pilots spent waiting for a request to fly did not constitute work mandating overtime pay because they could and did freely engage in

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

personal activities during this time, and therefore they did not work more than 40 hours per week.

Concurring in part and concurring in the judgment, Judge Collins wrote that, even assuming *arguendo* that the majority was incorrect in concluding that the pilots qualified as having been employed in a bona fide executive, administrative, or professional capacity, their claims still failed for the reasons stated in Section II of the court's opinion. Judge Collins therefore concurred in Section II and in the judgment.

## COUNSEL

Andre M. Lagomarsino (argued), Lagomarsino Law Offices, Henderson, Nevada; Jamie S. Cogburn, J. Cogburn Law, Henderson, Nevada; for Plaintiffs-Appellants.

Brian S. Kaplan (argued), DLA Piper LLP (US), New York, New York; Mary C. Dollarhide and Khesraw Karmand, DLA Piper LLP (US), San Diego, California; Molly M. Rezac, Ogletree Deakins Nash Smoak & Stewart PC, Reno, Nevada; for Defendants-Appellees.

# OPINION

M. SMITH, Circuit Judge:

Five corporate jet pilots appeal the district court's judgment holding that the pilots are exempt from the Fair Labor Standards Act's (the FLSA) overtime pay requirements, 29 U.S.C. § 207, and, in the alternative, that the pilots do not meet the 40-hour-per-week threshold to qualify for overtime pay. This appeal presents two questions: (1) whether corporate jet pilots are exempt from the FLSA as highly compensated, non-manual laborers, and (2) whether the time that corporate jet pilots spend waiting for a request to fly constitutes work. Because we answer the first question in the affirmative and the second in the negative, we affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Sean Kennedy, Andrew Snider, Christopher Ward, Randall Weston, and Ronald Williamson (collectively, the Pilots) worked as full-time corporate jet pilots for their joint employer, Sands Aviation, LLC and Las Vegas Sands Corp. (collectively, Sands). The Pilots flew Sands' customers and high-level executives and family members on Sands' planes. Sands paid the Pilots between $125,000 and $160,000 annually.

When each Pilot served as a Pilot-in-Command (PIC), he had ultimate decision-making authority on that flight and retained responsibility for the safety of that aircraft's passengers, crew, and property. The Pilots "regularly had to interpret flight data, analyze weight and balance requirements, assess the airworthiness of their planes, [and] make final decisions regarding the operation of the aircraft."

The Pilots had "absolute authority and accountability to operate, delay, divert, or cancel a flight as circumstances dictated." Sands also hired a separate Chief Pilot, not a plaintiff in this lawsuit, who "managed the [P]ilots and oversaw the safety and operational procedures the [P]ilots were required to follow." Although the Chief Pilot set procedures and regulations for the company, the Pilots could deviate from those procedures at their complete discretion during emergency conditions.

If Sands did not schedule a Pilot to fly in advance, it required him to be available to fly in the event of a pop-up flight, typically scheduled around 24 hours prior to departure. In the "rare event" of an immediate pop-up flight notification, Pilots were required to arrive at the hangar one hour prior to takeoff time. Sands notified the Pilots of these pop-up flights via email or text on their company cell phones and required them to respond to the flight notification and confirm their availability within 30 minutes.

The Pilots had days off each month, could call in sick, and could take vacation time. If the Pilots were "on call" (i.e., did not have the day off), they could still "reject flights for various reasons, usually due to illness." When no full-time Pilot could fly, Sands engaged contract pilots who filled in on a day-to-day basis.

While on call, the Pilots engaged in various personal activities during non-flight time, including eating at restaurants, watching movies, attending fitness classes, maintaining their homes and vehicles, and shopping. Sands routinely accepted time-off requests to engage in personal activities that would restrict the Pilots' ability to respond to emails within a reasonable time, including yoga classes, doctor appointments, and dental visits. Some Pilots also

maintained secondary employment, including flying for other companies or driving for ride-share services.

The Pilots and Sands had no written or oral agreement that Sands would provide specific compensation to the Pilots for time spent on call.  At the time of hiring, Sands advised the Pilots of this compensation and schedule structure.  The Pilots voluntarily accepted their employment and continued to work for Sands for several years under this arrangement.

The Pilots brought suit against Sands under the FLSA, seeking overtime pay for the time they spent on call between flight assignments, claiming that Sands misclassified them as exempt employees.   The Pilots sought between $1,000,000 and $1,500,000 in overtime pay over a three-year period, nearly 10 times their annual salaries, plus liquidated damages.

After an eight-day bench trial, the district court ordered judgment in favor of Sands.  It found the facts outlined above and held first that the Pilots qualified as highly compensated, exempt employees under the FLSA because they made over $100,000 per year, performed primarily non-manual labor, and customarily and regularly made discretionary decisions with respect to matters of significance.  Second, the district court held that, even if they were not exempt, the Pilots' waiting time between flight assignments did not constitute "work" mandating overtime pay under the FLSA because the Pilots could and did freely engage in personal activities.

This timely appeal followed.

**JURISDICTION AND STANDARD OF REVIEW**

The district court had jurisdiction to hear this case pursuant to 28 U.S.C. § 1331.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We "review the district court's findings

of fact for clear error and its interpretation of the FLSA *de novo*." *Berry v. Cnty. of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994).

## ANALYSIS

### I.   The FLSA exempts the Pilots from its overtime pay requirements.

The FLSA guarantees that covered employees receive overtime pay when they work more than 40 hours per week. 29 U.S.C. § 207(a); *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 43 (2023). An employee is not covered under the FLSA overtime rules if he or she earns "total annual compensation of at least $100,000"[1] and "customarily and regularly performs" any one of the many "exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601(a)(1); *Helix*, 598 U.S. at 45. A "high level of compensation is a strong indicator of an employee's exempt status" and "eliminate[s] the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c). The exemption also applies "only to employees whose primary duty includes performing office or non-manual work." *Id.* § 541.601(d).

Here, the parties agree that the Pilots earned between $125,000 and $160,000 annually and thus easily clear the $100,000 compensation threshold. However, the Pilots argue that the district court erred in concluding that they (1) performed primarily non-manual labor and (2) customarily and regularly made discretionary decisions of significance. We address each argument in turn.

---

[1] This amount increased since the period relevant to this case, as correctly noted by the district court.

### A.    The Pilots primarily performed non-manual labor.

Department of Labor regulations define employees who primarily perform manual work as including:

> non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy . . . no matter how highly paid they might be.

*Id.* The regulations also define the term "primary duty" to mean "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The regulations refer to non-exhaustive factors to consider in determining whether non-manual labor constitutes an employee's primary duty, including: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

The Pilots argue that they primarily performed manual labor because they performed "physically[] demanding tasks in connection with their jobs," repetitively used their hands to operate the airplanes, and received training via

apprenticeship and on-the-job training instead of via formal education.

The district court held that the Pilots' primary duty was the "safe transport of their passengers," and that "[a]lthough [the Pilots] used their hands and feet to fly the plane, their judgment, aviation acumen, and decision-making skills were far more important to the job of safely piloting a plane." We agree.

At trial, the Pilots testified that "[s]afe flight operations are always the priority," and that safety is their "most important" job and "primary function." The district court found that the decisions and actions that the Pilots used to safely fly the airplane included:

> overseeing selection of the route to take . . . ; inspecting the logbook and plane and determining whether the plane was airworthy; confirming the plane's center of gravity and that the weight was balanced; operating the plane's controls throughout the trip . . . ; analyzing and responding to problems and emergencies that arose, such as engine failure, wind shear, bird strikes, pre-flight and inflight de-icing, lightning strikes, contaminated runways, aircraft fires, in-flight illness and injury, and many other scenarios; reacting to changing weather conditions during the flight; identifying and deciding whether to land at an alternate airport; and

> inspecting the plane post-flight and reporting
> any incidents or problems.

While some of these tasks require physical movement, many of them do not. Instead, most of the tasks involve complicated decision-making processes, which include applying highly specialized knowledge and directing both the second-in-command pilot, the flight attendants, and any passengers on board.

Because of the complex mental decision-making required to safely operate an airplane, the Pilots are distinct from the manual laborers enumerated in the regulations, like construction workers, plumbers, or electricians. *See* 29 C.F.R. § 541.601(d). It is true that these manual laborers also prioritize safety in performing their jobs. But prioritizing safety in those contexts may only require following simple steps, such as wearing a hard hat, turning off a machine before repairing it, or cleaning up spills. The Pilots, on the other hand, could face a litany of potentially life-threatening scenarios each time they take off, many of which require specialized training to address. They can face catastrophic consequences if they do not respond to a challenging situation by diagnosing and actively resolving a problem. This distinction is underscored by the fact that the Pilots, unlike construction workers, can turn the planes on autopilot, engaging with their hands only if necessary to address a safety issue.

The Pilots contend that the distinction between manual and non-manual laborers should focus on apprenticeship and on-the-job training, rather than on the complexity of the employee's work. We note at the outset that Sands required the Pilots to engage in a high level of training, acquire air transport pilot certifications, and maintain type ratings for

the jets they fly.  In addition, Sands required training that educated the pilots on responding to situations which do not involve primarily physical responses, such as aircraft fires, ground evacuations, ditching an aircraft, crewmember incapacitation, hijacking, fatigue and stress management, thunderstorm avoidance, and more.  A manual laborer likely need not engage in the same level of training, particularly related to topics unrelated to physical labor.

Although the level of training required to perform a job is an important factor to consider, we disagree that the regulations draw a sharp line between formal education and on-the-job training.  For example, the language of 29 C.F.R. § 541.601(d) distinguishes between non-management and management employees.  A non-management production line worker would qualify as a manual laborer under subsection (d), whereas a management-level production line worker would not.  Subsection (d) does not distinguish between management and non-management workers by level of education.  Instead, the distinction between the two depends on the mental complexity of the task performed and the amount of physical labor required.  While retention of an advanced degree may be a sufficient condition to prove that work is non-manual, it is not a necessary condition.

The Pilots also refer us to a Department of Labor Opinion Letter, stating that "helicopter pilots . . . are not exempt administrative employees because their primary duty is piloting a helicopter, which does not qualify as 'office or non-manual' work."  DOL Opinion Letter FLSA2018-3.  Interpretations "contained in formats such as opinion letters are entitled to respect under . . . *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the power to persuade." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)

(cleaned up); *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 902 n.3 (9th Cir. 2023). The letter does not include any explanation for its decision and thus does not persuade us. *See* DOL Opinion Letter FLSA2018-3. Because the Pilots primarily engaged in complex decision-making focused on ensuring the safety of the passengers, crew, and airplane, we hold that they were primarily non-manual laborers.

## B. The Pilots customarily and regularly made significant discretionary decisions.

Because the Pilots made over $100,000, they need perform only one of many of the duties performed by bona fide administrative, executive, or professional employees to be exempt from the FLSA's overtime provisions. 29 C.F.R. § 541.601(a). Because the Pilots "exercise [] discretion and independent judgment with respect to matters of significance," 29 C.F.R. § 541.200, the FLSA's overtime provisions do not apply to them.

As the district court reasoned and as we explained above, the Pilots used discretion to exercise "judgment, aviation acumen, and decision-making skills" in flying airplanes. Although the Pilots argue that discretionary decisions happened only irregularly (in the event of an emergency), they regularly and customarily make discretionary decisions, even absent emergency conditions. For example, they create flight plans, which detail the altitude for the flight, route to be taken, and amount of fuel required, ensure the fuel levels balance safety with economy, confirm all safety systems work properly, brief the cabin crew before the flight and maintain regular contact throughout the flight, and react quickly and appropriately to environmental changes. Moreover, the Pilots actively monitor the flights' conditions to act in case of emergency on every flight.

The Pilots assert that the use of established procedures and checklists make their decisions non-discretionary. Department of Labor regulations specifically state that the

> use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part.

29 C.F.R. § 541.704.

The checklists and established procedures do not strip the Pilots of discretion. The procedures require the Pilots to make discretionary decisions and use their extensive specialized knowledge to decide which course of action is appropriate in any given situation. Although the checklists remind the Pilots of what to do in response to various external conditions, they must be able to respond to certain emergency situations without reference to any checklist. Some procedures contain highly specific instructions, while others explicitly leave actions up to the Pilots' discretion. For example, when the aircraft, passengers, or crew are "in jeopardy," the Pilots are instructed to "remember three things. FLY THE AIRCRAFT – Maintain aircraft control. RECOGNIZE CHALLENGE – Analyze the situation. RESPOND – Take appropriation action." [2]   The Pilots thus

---

[2] As another example, the "Smoke in Baggage Compartment" section of the Pilots' Quick Reference Handbook states that "*consideration should be given to* descending to 20,000 ft." Even though the instruction

have discretion to respond to external stimuli, must determine which checklist applies, and, if multiple problems occur at once, must make discretionary decisions about what course of action to take. *See also* 14 C.F.R. § 91.3(a) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."). Pilots may also deviate from the checklists to the extent necessary to respond to an emergency. *Id.* § 91.3(b). These decisions are thus "free from immediate direction or supervision." 29 C.F.R. § 541.202(c).

The Pilots argue that their decisions do not involve matters of significance because they do not relate to the operation of the business. They point to the fact that Sands hired a Chief Pilot, who "managed the [P]ilots and oversaw the safety and operational procedures the [P]ilots were required to follow." The term "matters of significance" refers to "the level of importance or consequence of the work performed." *Id.* § 541.202(a). One additional factor to consider in deciding whether the Pilots have discretion to make decisions over matters of significance is "whether the employee has authority to waive or deviate from established policies and procedures without prior approval." *Id.* § 541.202(b). Although the Chief Pilot may establish general policies and procedures for the PICs to follow, the Pilots still maintain "absolute authority and accountability for decisions to operate, delay, divert, or cancel a flight, as circumstances dictate." The Pilots testified that they individually made decisions about routes, fuel, flight plan, and decisions to refuse to take off or land if "something

---

contains specific details about a possible course of action, it does not mandate that the Pilot take that action without independent consideration.

looked amiss." They could also reject flights, crews, and planes based on safety concerns. Thus, while the Chief Pilot certainly made discretionary decisions over matters of significance, the Pilots had authority to override or deviate from those very decisions at their complete discretion. Once the cabin doors closed, the Pilots had complete control over the plane's operation. These decisions involved "matters of significance."

The Pilots attempt to bolster their argument by citing *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002), but that case is easily distinguishable. There, we held that there were genuine issues of material dispute about whether an employee was permitted to make discretionary decisions of significance where his supervisor made "all but the smallest decisions." *Id.* at 1129. Here, as previously explained, the Pilots maintained unilateral and final authority in operating and managing the aircraft and need not ask permission to make any decision while preparing or engaging in flight.[3]

We hold that the Pilots made discretionary decisions over matters of significance, thus exempting them from the FLSA's overtime requirements.

## II.  The Pilots do not meet the FLSA's hour requirement to receive overtime pay.

Even if the Pilots did not qualify as exempt employees under the FLSA, the statute would still not entitle them to overtime pay because they did not work more than 40 hours

---

[3] *McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847 (9th Cir. 2017), also does not control because it did not reach the question of whether mortgage underwriters exercised discretion and independent judgment. *Id.* at 849 n.1.

per week.  As described above, the FLSA requires employers to pay an employee "not less than one and one-half times the regular rate at which he is employed" for "a workweek longer than forty hours."  29 U.S.C. § 207(a)(1).

The Pilots claim that they worked more than 40 hours per week because the time they spent on call waiting for a flight assignment constituted time worked.  Because the Pilots assert that they spent 24 hours per day, seven days per week on call, they argue that they worked well over 40 hours per week.  Sands argues that the time spent on call does not constitute time worked, and instead, proffers that the evidence showed that the Pilots only performed between 5.4 to 7.2 hours of direct flight-related work per week.

To determine whether time spent on call but not actually flying aircraft or preparing to fly aircraft constitutes time working for purposes of overtime pay, we consider two predominant factors: "(1) the degree to which the employee is free to engage in personal activities; and (2) [an] agreement[] between the parties" suggesting the time waiting was compensable. *Owens v. Loc. No. 169, Ass'n of W. Pulp and Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992) (footnote omitted); *see Berry*, 30 F.3d at 1181–82.

The Pilots' on-call time does not constitute compensable work because, although Sands paid them without regard to whether the Pilots flew during a particular time period, the on-call time was virtually indistinguishable from free personal time, and the parties' agreement did not suggest that on-call time was compensable.

### A. The Pilots regularly used their on-call time for personal activities.

To determine "the degree to which [an] employee is free to engage in personal activities," we look to "whether [an employee] is so restricted during on-call hours as to be effectively engaged to wait." *Owens*, 971 F.2d at 350, 354. To make that determination we consider seven non-exhaustive factors, including:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Id.* at 351 (footnotes omitted). An employee "need not 'have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject.'" *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 936 (9th Cir. 2004) (quoting *Owens*, 971 F.2d at 350–51). Based on a review of these factors, the Pilots were not engaged to wait and, instead, could freely use their on-call time for their personal benefit and enjoyment.

First, Sands did not require the Pilots to live on or in close proximity to the hangar, so long as the Pilots could arrive one hour prior to the flight time. *Cf. id.* (noting that an employer requirement that employees live on the company's premises favored employees' argument). This factor weighs against finding that the Pilots' on-call time constituted time worked.

Second, although Sands placed no formal geographical restriction on the Pilots, they did need to remain within an hour's travel from the hangar in the rare event of an immediate flight. Thus, a functional geographic restriction controlled the Pilots' movements. Whether this restriction was "excessive" is less clear. *Owens*, 971 F.2d at 351. Even assuming, without deciding, that this factor weighs in favor of holding that the Pilots' on-call time constituted time worked, it does not tip the scale.

Third, "the frequency of calls" was not "unduly restrictive." *Id.* at 351. The Pilots received flight notifications via email or text message. In *Berry*, we held that call notifications every four to eight hours were insufficient to outweigh the other *Owens* factors. 30 F.3d at 1186. Although the Pilots generally supervised their email accounts, they received requests far less frequently than every four to eight hours. In fact, the Pilots rarely received a request for a same-day flight. This factor weighs against finding that the on-call time constituted time worked. *See Brigham*, 357 F.3d at 936 (explaining that receiving requests to work once or twice a month weighed in favor of employers).

Fourth, the fixed time limit to respond to a request to fly was not unduly restrictive. Sands required the Pilots to respond to an email request within 30 minutes. In *Berry*, we

concluded that a "required response by telephone or two-way radio within fifteen minutes is not a factor prohibiting the [employee's] personal pursuits." 30 F.3d at 1184. The same is true here. Requiring that an employee respond to an email within 30 minutes does not unduly restrict the Pilots' personal pursuits, particularly where Sands would routinely grant time-off requests (without deducting flex or vacation time) when the Pilots notified Sands that a 30-minute response time would be unpracticable.

The fifth factor, whether an employee could easily trade on-call responsibilities, also weighs against the Pilots. Although the evidence in the record does not support a finding that the Pilots literally traded responsibilities with one another, the Pilots could simply communicate to Sands that they were sick or otherwise unavailable. In the event that any Pilot were unavailable, the scheduler merely moved down to the next pilot on the list. There is no evidence in the record that any Pilot faced significant repercussions for being unavailable.

The sixth factor, whether the use of a pager could ease restrictions, also weighs against finding time worked. Obviously, today's technological landscape renders pagers obsolete. We interpret this factor, instead, to ask whether technology allows an employee to move freely and communicate with his or her employer without being tethered to a physical location. *See Berry*, 30 F.3d at 1184 ("By being able to use a pager, the [employees] are not restricted to areas with a telephone or two-way radio."). The Pilots could still engage in personal activities away from their homes or the hangar so long as they monitored their email accounts and text messages. And if their activities, such as hiking, drinking alcohol, or attending fitness classes, made monitoring their work phones impossible, they could

notify the scheduler of their unavailability without using flex or vacation time. This factor thus weighs against finding time worked.

Seventh and most importantly, Sands presented fulsome evidence at trial that the Pilots enjoyed personal pursuits that made their on-call time virtually indistinguishable from an average person's free time. They dined at restaurants, patroned the movie theater, exercised at the gym, attended fitness classes, shopped, and spent time with their families and friends. Evidence at trial even showed that most engaged in secondary employment. *See Berry*, 30 F.3d at 1185 ("[T]he ability of [the employees] to maintain secondary employment while on-call undermines the [employees'] position that they are unable to actually pursue personal activities.").

This is not a case where the *Owens* factors are "closely divided." *Brigham*, 357 F.3d at 936. Nearly every factor weighs against finding that the Pilots' on-call time constituted time worked. We therefore hold that the Pilots could freely engage in personal pursuits and were not "engaged to wait." *Owens,* 971 F.2d at 354.

The Pilots, nonetheless, argue that because Sands did not inform them of a definitive hour at which their work commenced in advance, Sands never relieved the Pilots from duty. The Pilots cite Section 785.16, which recites the Department of Labor's general view that for an employee to be considered off duty, he must be "definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived." 29 C.F.R. § 785.16(a). The Pilots' characterization of this regulation would eviscerate the *Owens* test, as any on-call worker would be considered

constantly working, regardless of the extent to which they could utilize their on-call time for their personal endeavors. Although Sands did not always specify a definitive hour in advance, pop-up flights were rare, and the Pilots were free to use the time between flights at their complete discretion. Thus, the elapsed time was "long enough to enable [the Pilot] to use the time effectively for his own purposes" based on "all of the facts and circumstances of the case," as analyzed above.  29 C.F.R. § 785.16(a).

### B.   The agreement between the parties did not suggest that on-call time was compensable.

A constructive agreement to not pay employees overtime pay for certain activities may arise "if employees have been informed of the overtime compensation policy and continue to work under the disclosed terms of the policy." *Brigham*, 357 F.3d at 938 (quoting *Berry*, 30 F.3d at 1180).  The character of the agreement assists the district court in determining whether the parties characterized the on-call time as time worked.  *Berry*, 30 F.3d at 1180–81.  For example, "[a]n agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work."  *Id.* at 1181.  On the other hand, "an agreement pursuant to which the employees are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work."  *Id.*

The district court's factual findings on this issue were not clearly erroneous.  It found that there was no evidence in the record of an agreement to pay the Pilots for on-call time. Sands paid the Pilots on an annualized salary basis.  The Pilots, according to the district court's findings, had no

expectation of additional compensation regardless of the hours worked or not worked per week, that they were advised of the compensation and work structure prior to accepting employment, and that they worked for Sands for several years under that agreement. These findings are amply supported by the record. These facts suggest that the Pilots and Sands did not characterize the on-call time as time worked.

The Pilots claim that because they were paid regardless of how much they flew, the agreement of the parties indicated that they were paid for their on-call time. This argument makes little sense. Sands paid the Pilots on an annualized salary basis. It is typical for workers paid on an annualized-salary basis to receive compensation without regard to how much or little they work. Such a characterization does not independently evince an intent of the parties to pay the Pilots for their time spent on call. And even if the Pilots were correct that Sands intended to compensate them for time spent on call, the character of the parties' agreement "is not intended to suggest that agreements are controlling regardless of the character of the uncompensated time at issue." *Id.* The *Owens* factors, as described above, heavily weigh in favor of holding that the Pilots were waiting to engage, not engaged to wait.

The Pilots refer us to *Leever v. Carson City*, 360 F.3d 1014 (9th Cir. 2004), but that case is inapposite. First, the plaintiff in *Leever* was not an on-call employee. *Id.* at 1016. And second, the parties there explicitly characterized the time worked as overtime work but disagreed about how to compensate the employee for such work. *Id.* This is not such a case. The parties here sharply dispute whether the time spent on-call constitutes work.

Because the Pilots' on-call time does not constitute "work," they did not prove that they worked over 40 hours per week.[4]  Thus, they are not entitled to overtime pay, even if the FLSA did not exempt them as highly compensated employees.

## CONCLUSION

For the foregoing reasons, the district court's judgment is **AFFIRMED**.

---

COLLINS, Circuit Judge, concurring in part and concurring in the judgment:

I am not sure that the majority is correct in concluding that the private jet pilots who are the Plaintiffs in this case count as having been "employed in a bona fide executive, administrative, or professional capacity" with the permissible limits of that phrase. 29 U.S.C. § 213(a)(1).  But I need not resolve that question because, even assuming *arguendo* that the majority is wrong on that score and that Plaintiffs' positions therefore were not exempted from the overtime provisions of the Fair Labor Standards Act, Plaintiffs' claims still fail for the reasons stated in Section II of the court's opinion.  I therefore concur in Section II of the court's opinion and in the court's judgment.

---

[4] The Pilots also argue that the time they spent waiting between flight segments away from Las Vegas constitutes hours worked.  Because they did not make this argument below, it is waived. *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543 (9th Cir. 2016) ("Generally, an appellate court will not hear an issue raised for the first time on appeal.").